# EXHIBIT A



**U.S. Equal Employment Opportunity Commission**
**New York District Office**

33 Whitehall Street
5th Floor
New York, NY 10004
(212) 336-3620
TTY (212) 336-3622
FAX (212) 336-3625
1-800-669-4000

Respondent: PRICE WATERHOUSE
EEOC Charge No.: 160-2005-01264
FEPA Charge No.:

Mar 14, 2005

Harold  Schuler
2191 Pond View Court
Reston, VA 20191

Dear Mr. Schuler:

This is to acknowledge receipt of the above-numbered charge of employment discrimination against the above-named respondent.  Please use the "EEOC Charge No." listed above whenever you call us about this charge.  The information provided indicates that the charge is subject to:

      [ ]     Title VII of the Civil Rights Act of 1964 (Title VII)

      [ X ]   The Age Discrimination in Employment Act (ADEA)

      [ ]     The Americans with Disabilities Act (ADA)

      [ ]     The Equal Pay Act (EPA)

You need do nothing further at this time.  We will contact you when we need more information or assistance.  A copy of the charge or notice of the charge will be sent to the respondent within 10 days of our receipt of the charge as required by our procedures.

[ X ]    Please be aware that we will send a copy of the charge to the agency listed below as required by our procedures.  If the charge is processed by that agency, it may require the charge to be signed before a notary public or an agency official.  Then the agency will investigate and resolve the charge under their statute.  If this occurs, section 1601.76 of EEOC's regulations entitles you to ask us to perform a Substantial Weight Review of the agency's final finding.  To obtain this review, a written request must be made to this office within 15 days of receipt of the agency's final finding in the case.  Otherwise, we will generally adopt the agency's finding as EEOC's.

New York State Division Of Human Rights
Federal Contract Unit
One Fordham Plaza, 4 Fl.
Bronx, NY 10458

Please notify this office of any change in address or of any prolonged absence from home.  Failure to cooperate in this matter may lead to dismissal of the charge.

Sincerely,

Patricia M. Araujo
Investigator
(212) 336-3681

Office Hours: Monday - Friday, 8:30 a.m. - 5:00 p.m.
TDD: 1-800-669-6820
www.eeoc.gov

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy act of 1974; See Privacy Act Statement before completing this form.

Enter Charge NUMBER
☐ FEPA
x EEOC NYDO-CRT
0126

**New York City (NY) Commission Human Rights, and New York State Div. of Human Rights,**

[State or local Agency, if any] and EEOC

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (include Area Code) |
|---|---|
| Mr. Harold Schuler | (703) 476-6476 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 2191 Pond View Court | Reston, Virginia 20191 | October 21, 1944 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME of Employer | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (including Area Code) |
|---|---|---|
| PricewaterhouseCoopers, LLP | more than 23,000 | 646 471-4000 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1301 Avenue of the Americas | New York, New York 10019 | New York |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

DISCRIMINATION TOOK PLACE
EARLIEST 1999
LATEST July 1, 2004 or later

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION
☐ NATIONAL ORIGIN ☐ RETALIATION X AGE
☐ DISABILITY ☐ OTHER (Specify)

X CONTINUING ACTION
From 1999 through July 1, 2004
And continuing

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)

The Employer, PwC has followed and continues to follow age discriminatory practices for promotion to partnership that favor employees younger than 40 years old and harm me and other older employees. PwC refuses to promote employees close to or above the age of 60 to partnership, and excludes from consideration long term professional employees who are 45 or more years of age. PwC has promoted more than 1,500 of its professional employees to partnership on and after July 1, 1998 through at least July 1, 2004, and not one (0) of those promoted was over the age of 60 when promoted. Respondents promote few if any employees over the age of 45 to partnership.

I file this charge as a Class Action Charge on behalf of myself and the class of professional employees of PwC of age 45 years and older. I have set forth my allegations in more detail in the 8 page Declaration which is attached to and made a part of this Class Action Charge of age discrimination.

I want this Class Action Charge filed with both the EEOC and the State and local Agency, if any. I will advise the agencies if I change my address or telephone number and will cooperate fully with them in the processing of my charge in accordance with their procedures.

I affirm that I have read the above Class Action Charge, and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

I declare under penalty of perjury that the foregoing is true

Charging Party (Signature)

Harold Schuler

NOTARY - (When necessary for State and Local Requirements)

SUBSCRIBED AND SWORN TO BEFORE ME
DATE (Day, month, and year)

RECEIVED
FEB 2 3 200
EEOC-NYDO-CR

## DECLARATION OF HAROLD SCHULER
## IN SUPPORT OF HIS CHARGE OF DISCRIMINATION

I Harold D. Schuler declare under penalty of perjury that the facts set forth below are true to the best of my knowledge and belief.

1. I reside at 2191 Pond View Court, Reston, VA 20191.

2. The headquarters of Respondent PricewaterhouseCoopers, LLP ("PwC") is located at 1301 Avenue of the Americas, New York, New York 10019.

3. I have been employed by PwC and its predecessors Price Waterhouse, LLP and Price Waterhouse since October 1988.

4. I was born on October 21,1944 and am now 60 years of age.

5. Respondent PwC has on the basis of age denied me and its other older professional employees opportunities for promotion to partnership rooted in policies and procedures adopted and maintained by Respondent's Senior Partner and Chief Executive Officer Dennis Nally and the 14 other members of its Board of Partners and Principals that so discriminate:

a. The partnership agreement of Respondent requires a "partner" or "principal" to retire at age 60, absent prior approval by the Board of Partners and Principals of Respondent, which is rarely granted.

b. One consequence of the policy and practice of Respondent pursuant to that agreement is that Respondent does not promote any professional employee 60 years old or older to partnership, and as a practical matter does not promote any long term professional employee above the age of 50 to partnership, and rarely promotes employees age 45 or older to partnership.

-1-

c.  I am qualified for promotion to partner.  In 1969 I joined the staff of the Office of the Comptroller of the Currency in Minneapolis as an assistant national bank examiner.  I was transferred to Washington, D.C. in 1972 to supervise the OCC's examinations of international divisions and overseas offices of national banks.  I was commissioned in 1973 as a national bank examiner.  In 1979 I was transferred to London, England for three years, where I supervised the OCC office responsible for examining national bank branches and subsidiaries in London and elsewhere in Europe.  While in OCC's Washington, D.C. office, I created a methodology still used today for measuring the cross-border exposure of U.S. banks.

In 1985 I joined the Institute for International Finance, an organization started by the major banks to serve as a centralized source of credit information about developing countries.

In 1986 I joined the Farm Credit Administration and helped to design the rescue package for a failing farm credit system.

I joined Respondent's Regulatory Advisory Services staff in 1988 as its first professional employee.  I have successfully managed and assisted with a variety of projects.  When the records of the central bank of Nicaragua disagreed with those of the country's creditor banks, I headed a complex and successful engagement to reconcile the differences.  I temporarily filled the position of treasurer for a regional bank which lost its treasurer.  I worked on a successful multi-year assignment in the mid-1990s for the Peoples Bank of China, that country's central bank.  I generated and managed projects earning an average of $1 million per year over my 16 years with PwC, and have continued to generate revenue at this pace during the past five years. In addition, I have contributed thousands of chargeable hours to other projects.

The growth and success of the Regulatory Advisory Services group in Washington is due in large part to my services and those of the two or three other professionals hired shortly after I was. Yet none of us has been promoted to partner.

       d.  I hold the position of Managing Director, and have held that position since 1994. That title was discontinued shortly after the merger creating PwC, and I was reappointed to that position in October 2004. That is the highest position held by professional employees of Respondent who are recognized as employees. My qualifications and work performance are better than those of younger employees who have been promoted to partnership  including those employees who were promoted on or about July 1, 2004, and on or about July 1, 2003, or in prior years. I have won and managed projects bringing to PwC more than $16,000,000 in my career with PwC.

      6.  The Respondent's age discriminatory practices against me and other older professional employees in promotion to partnership have continued to this date, although Respondent made its most recent batch of promotions of professional employees to partnership on or about July 1, 2004.

      7.  In October 2004 the Respondent promoted over 200 professional employees to the position of Managing Director.  On information and belief, all or the great majority of those employees were over the age of 40 when promoted, and are older than the great majority of employees that PwC has promoted to partnership.  The Respondent PwC pays substantially less money and benefits to me and other managing directors than to those persons who have the title of "partner" or "principal."

8. Respondents Nally and other members of the Board of Partners and Principals of PwC have continued to implement the age based policies although they had full knowledge of the likelihood that such policies are in violation of federal, state and local equal employment opportunity laws. That Board decides each year which employees shall be promoted to partnership. Respondents Nally and other members of the Board continue to implement the unlawful policy of PwC by selecting employees for partnership based upon age rather than on abilities and skills, and by excluding me and other long term older professional employees over the age of 45 from consideration for each promotion in whole or in substantial part because of our age.

9. I make these allegations on my own behalf and on behalf of the class of professional employees of Respondent PwC over the age of 45. Unless this administrative claim is settled by agreement, I plan to enforce my rights and the rights of other members of the class of professional employees over the age of 45 who have been harmed by the same discriminatory age based promotion policy of Respondents under the Federal Age Discrimination in Employment Act and under the Human Rights Law of New York, and the Human Rights Law of New York City, and the Human Rights Act of the District of Columbia, by filing a lawsuit in an appropriate forum.

I charge the Respondents with unlawful discriminatory practices against me and other older professional employees on the basis of age in violation of the laws of United States and in violation of the laws of New York and the District of Columbia set forth above. I charge that those practices have continued to this date and that they are likely to continue in the absence of an appropriate lawsuit.

I have commenced no civil, criminal or other administrative actions based on the above allegations concerning promotions made by PwC subsequent to July 1, 2003. I have filed similar charges involving similar discriminatory conduct by PwC on July 1, 2003 and earlier years in the case of <u>Murphy and Schuler v. Pricewaterhouse Coopers, LLP</u>, Civ. Action 02-982 (RJL), and in the prior administrative proceedings under the District of Columbia Human Rights Act.

This complaint should be CROSS FILED WITH THE HUMAN RIGHTS AGENCIES OF NEW YORK CITY, THE STATE OF NEW YORK, AND WASHINGTON, D. C..

_____
COMPLAINANT

Done this 22 day of February 2005.

# EXHIBIT B

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |
| | | and EEOC |

State or local Agency, if any

| Name *(Indicate Mr., Ms., Mrs.)* | Date of Birth |
|---|---|
| Mr. C. Westbrook Murphy | 1/30/1940 |

| Street Address | City, State and ZIP Code |
|---|---|
| 400 Fairlea Dr. | Edgewater, MD 21037 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two are named, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| PricewaterhouseCoopers L.L.P. | more than 500 | (202) 414-1000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1301 K St., NW   Suite 800W | Washington, DC 20005 |

| Name | No. Employees, Members | Phone No. with Area Code |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☒ AGE   ☐ DISABILITY   ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: July 1, 2004    Latest: ongoing

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Please see the attached statement.

District of Columbia : SS
Subscribed and Sworn to before me, in my presence,
this 04 day of March, 2005

*Gretchen R. Waller*
Gretchen R. Waller, Notary Public, D.C.
My commission expires May 31, 2009

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
|---|---|
| | *C. Westbrook Murphy* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br>*Gretchen R. Waller* |
| 3/4/05    *C. Westbrook Murphy*<br>Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)*<br>March 04, 2005<br>Gretchen R. Waller<br>Notary Public, District of Columbia<br>My Commission Expires 5-31-2 |

UNITED STATES OF AMERICA
EQUAL OPPORTUNITY EMPLOYMENT COMMISSION

IN THE MATTER OF

| | |
|---|---|
| C. WESTBROOK MURPHY,<br>and OTHER AFFECTED EMPLOYEES<br>OF PRICE WATERHOUSECOOPERS,<br>LLP<br><br>          Complainant,<br><br>v.<br><br>PRICEWATERHOUSE COOPERS, LLP,<br><br><br>          Respondent.<br>_____ | )<br>)<br>)<br>)<br>)<br>)    Docket No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DISCRIMINATION COMPLAINT

Complainant C. Westbrook Murphy ("Murphy"), residing at 400 Fairlea Drive, Edgewater, MD 21037, charges PricewaterhouseCoopers ("PwC"), whose address is 300 Madison Avenue, New York, NY 10019, with discrimination in employment because of his age. This charge is filed on behalf of Murphy and on behalf of similarly situated PwC professional employees. In particular, Respondent has:

- Denied Complainant and other older PwC non-partner professional employees promotional opportunities and discriminated in pay and benefits because of their ages, and
- Forced employees who are "partners" to retire at age 60.

These discriminatory practices occurred during 2004 at PwC's offices at 1301 K Street, N.W., Washington, DC 20005, and elsewhere throughout the United States, affected Complainant and other PwC employees throughout the United States, and continue the age-based discriminatory pattern and practices occurring since PwC was created effective July 1, 1998.

THE PARTICULARS ARE:

1.  PwC is a nationwide accounting and professional services firm, employing approximately 27,500 individuals in the United States.

2.  Since 1989 PwC or one of its predecessor firms has employed Murphy at PwC's offices in the District of Columbia.

    a.  Murphy was born on January 30, 1940, and now is 65 years old.
    b.  In March 2001, Murphy filed with the District of Columbia Office of Human Rights (Docket Nos. 01-060-P(CN) and 02-039-P(CN)), and crossed-filed with this Commission, charges of age discrimination. In May 2002, Complainant sued PwC and others in the United States District Court for the District of Columbia, and consequently withdrew his charge from further administrative consideration. *Murphy & Schuler v. PwC, et al.*, Civil Action No. 01-02cv982 (RJL/DAR). Those claims are pending in U.S. District Court.

3.  Murphy now charges that during 2004 PwC discriminated against him, and continues to discriminate against him, in consideration for promotion to partnership, in pay and benefits, and in work assignments, as detailed hereafter. This discrimination occurred because of Complainant's age. Complainant alleges that during 2004 PwC discriminated against other older PwC employees in work assignments, in pay and benefits, and in consideration for promotion because of their ages; and that PwC required many partners who are by law employees to retire because they had reached the age of 60.

4.  PwC is organized under the law of the State of Delaware as a limited liability partnership.

5.  PwC has adopted a Partners and Principals Agreement ("Agreement") to govern its structure and operations. A copy of the agreement is annexed hereto as Appendix A. This Agreement (Section 5.1) creates a Board of Partners and Principals ("Board") to manage PwC, and vests with the Board exclusive powers, *inter alia*, to:

    a.  Approve all policies affecting the rights, responsibilities, or obligations of partnership members (§5.6(a));
    b.  Approve PwC's philosophy, policies, and direction (§5.6(b));
    c.  Approve the admission of employees to partnership (§5.6(c));
    d.  Submit to the partnership proposed amendments to the Agreement (§5.6(f));
    e.  Determine PwC's net capital and contribution to capital required of partnership members (§§5.6(s) and 9.1); and
    f.  Approve policies for the participation of partnership members in PwC's profits and losses (§§5.6(t) and 8.1).

6.  Members of the partnership consist of "partners," who are certified public accountants ("CPA") and "principals," who are not CPAs (Agreement §2.3). A

principal may not sign an audit opinion or perform other services which may be rendered only by a CPA (*id.*). "Partners" and "principals" sometimes are referred to in the Agreement as "Individuals" (*id.* at Art. 1). Unless the context otherwise requires, "partner" as used in this charge includes any member of the partnership, whether or not he or she is a CPA.

7. Section 10.1 of the Agreement provides that a partner's association with the firm shall cease at the end of the fiscal year in which or she attains age 60, or in limited circumstances, age 62. PwC's fiscal year ends on June 30. Section 10.1 acts as a mandatory retirement age for every partner.

8. Each fiscal year PwC evaluates more than 100 non-partner employees for promotion to partnership. Those whose candidacy is successful are admitted to partnership as of the next July 1, the first day of PwC's fiscal year.

9. The Age Discrimination in Employment Act, 29 U.S.C. §§621 *et seq.*, ("ADEA") and the District of Columbia Human Rights Act, D.C. Code §§2-1401 *et seq.*, ("DCHRA") prohibit Respondents from discriminating in the terms, conditions, or privileges of Complainant's employment because of Complainant's age. Consideration for promotion to partnership, pay, benefits, and work assignments are each legally protected terms, conditions, or privileges of employment.

10. The mandatory partner retirement age alleged in Paragraph 7 established an age-based requirement for partnership admission which wholly disqualifies Murphy from being considered for partnership. As a result, Murphy was not considered for promotion to partnership when 103 other employees were promoted to partnership effective July 1, 2004. (*See* Appendix B, June 4, 2004 memorandum.) Respondents' refusal to consider Complainant and other older PwC employees for promotion to partnership because of their age violates the ADEA and the DCHRA.

11. PwC expressly acknowledges that Murphy, because of his age, cannot be admitted to PwC's partnership: PwC informed the U.S. District Court that ". . .the sole impact of Murphy's admission as a partner would be his immediate retirement. . . ." Defendant's Memorandum of Points and Authorities filed Oct. 23, 2004 in *Murphy & Schuler v. PwC et al., supra* (Oct. 23, 2003). Respondents thus acknowledge that the mandatory retirement age for employees who are called "partners" directly interferes with Complainant's right under the ADEA to be considered for promotion without regard to his age.

12. PwC's explicitly age-based qualification for partnership has resulted, and continues to result, in additional age-based discriminatory treatment of Complainant and other PwC employees who are candidates and potential candidates for admission to the PwC partnership.

   a. Since PwC's creation on July 1, 1998, no employee age 60 or older has been promoted to partner.

b. The leader of PwC's Banking Practice—which includes Complainant—has stated that PwC prefers to promote to partnership employees ". . .who can be partners for 20 years or more to become partners so you can continue to grow the practice." (*See* Appendix C, April 13, 2003 memorandum.)  Since a partner must retire at age 60, employees who are 40 or younger are the only ones ". . .who can be partners for 20 years or more. . . ," and these younger employees thus enjoy a significant advantage in consideration for partnership.

13. As a result of PwC's aged-based preference for promoting younger employees to partnership:

a. The average age of a PwC employee selected for partnership is 37.
b. According to information PwC produced, during the period between PwC's creation on July 1, 1998 and September 15, 2003, PwC promoted 1,263 employees to partnership.  Of those:
    i)  949, or 75%, were under age forty;
    ii) Only 85, or 7 %, were age 45 or older;
    iii) Only 25, or less than 2% were age 50 or older; and
    iv) Only 4 were age 55 or older.
    In short, the older an employee becomes after age 40, the less chance he or she has of being considered for partnership.

14. Employees have no opportunity to apply for partnership with PwC.  Murphy has repeatedly expressed interest in being promoted into the partnership.  Murphy understands the process used in 2004 to consider employees for promotion within the Banking Practice (which included Murphy), as explained by the partner who led the Banking Practice, to be:

a. Twice yearly he (the leader of the Banking Practice) solicits the approximately 50 partners of the Banking Practice for their recommendations about which employees should be promoted to partner within the next few years;
b. He uses these recommendations in creating and maintaining a list of those whom he believes should be candidates for promotion to partner;
c. He selects an existing partner to be each potential candidate's sponsor;
d. Each summer he selects five to eight individuals whom the Banking Practice proposes for admission to partnership effective the following July 1; and
e. He asks each candidate's sponsoring partner to complete a form proposing the candidate for partnership.

(*See* Appendix D, January 28, 2002 memorandum;  Appendix E, October 3, 2003 and September 24, 2003 memoranda.)

15. After the nomination process described in Paragraph 14, the proposal for each candidate then is reviewed by a business unit review committee composed of partners in PwC's Financial Services Practice, of which the Banking Practice is a component part.  The leader of the Financial Services Practice uses the results of this review to

4

select from among the nominees for partnership those whom he will recommend to PwC's partnership admission committee. After review by the partnership admissions committee, the Board determines which employees will be promoted to partnership effective the following July 1. (*See* Appendix E; *see also* Appendix F, December 3, 2001, November 29, 2001, and November 15, 2001 e-mails and memoranda.)

16. PwC's preference to admit to the partnership employees under age 40 who can serve as partners for 20 years, encourages PwC's partners to assign the management of large and complex client engagements to non-partner employees in their 30s, so that these younger employees will have opportunities to demonstrate their managerial and client relationship abilities and thereby improve their chances for being selected for partnership. This practice discriminates in work assignments given to Complainant and, on information and belief, to other older PwC non-partner employees.

17. Because of Complainant's age and PwC's discriminatory pattern and practices, PwC refused to consider him for partnership, and did not promote him to the position of partner when other, younger and less experienced employees were promoted to partner, effective July 1, 2004.

18. Murphy repeatedly has called PwC's aged-based discriminatory practices to the attention of appropriate PwC management officials, including communications:

   a. In June 2001, to PwC's Ethics Office, as shown in the June 25, 2001 and February 20, 2002 memoranda (Appendix G);
   b. In April 2002, to PwC's Chief Diversity Officer, as shown in April 5, 2002 memorandum (Appendix H);
   c. In April 2002, to PwC's National Director of Human Resources, as shown in the April 5, 2002 and April 29, 2002 memoranda (Appendix I);
   d. In May and June 2002, by service on Respondent Nally and on each other then member of the Board of a summons and the complaint in the lawsuit for age discrimination identified in Paragraph 2; and
   e. In June 2004, to PwC's Vice Chairman for Operations, Chief Diversity Officer, National Marketing Director, and leader of U.S. Tax Services, as shown in the June 15, 2004 memorandum (Appendix J).

19. PwC continues to maintain its unlawful policy of selecting employees for promotion to partnership based upon age, rather than on abilities and skills.

20. Complainant (apart from his age) was as well or better qualified to become partner as the PwC employees who were promoted to partner effective July 1, 2004. Because PwC bases its selection for partnership on an employee's performance over a sustained period of years, information in Paragraphs 21 through 29 is not confined to 2004.

21. At all relevant times, approximately 25% of the revenues of PwC and its predecessor firms have been generated by clients in the financial services industry, including

banks. The business of banks and other financial service firms is subject to
significant regulation by federal and state governmental agencies. To assist both the
firm and its clients in understanding and responding to this governmental regulation,
Price Waterhouse, a predecessor of PwC, in 1987 establish in Washington, DC, a
Regulatory Advisory Services practice ("RAS"). Price Waterhouse recruited Robert
R. Bench, then a U.S. Deputy Comptroller of the Currency, to become a partner of
Price Waterhouse and initiate and head this RAS practice. Bench continued to head
the RAS practice until he retired at age 60, effective June 30, 2003.

22. Bench was the sole professional assigned to this RAS practice until he recruited first
Harold Schuler in 1988 and then Murphy in 1989 to join as, respectively, the second
and third RAS professional employees. Murphy and Schuler are still employed in the
RAS practice.

23. Prior to joining PwC in 1989, Murphy was highly experienced in, and knowledgeable
about, the regulation of banks and other financial institutions.

   a.  Murphy's experience included:

      i)   With the U.S. Department of Justice: hired in 1965 as a trial attorney for the
           Civil Division;
      ii)  With the Office of the Comptroller of the Currency ("OCC"):
           (1) Hired in 1967 as Director of Litigation,
           (2) Appointed in 1970 as Deputy Chief Counsel,
           (3) Appointed in 1975 as Deputy Comptroller for Law and General Counsel,
           (4) Appointed in 1976 as Deputy Comptroller for Administration, and while
               serving in this position:
               (a) Acted as liaison with the U.S. Treasury Department,
               (b) Created a new Human Resources Office and program, and
               (c) Developed the first budget in the then 112-year history of the OCC
      iii) In private law practice beginning in 1978, representing banks and other
           financial institutions.

24. Since 1989, Complainant has contributed significantly to the success and growth of
the RAS practice, which now employs more than two dozen professionals, and to the
reputation of PwC as a leading professional services firm for financial institutions.
Tim Ryan, now leader of PwC's Financial Services Practice describes RAS as ". . .the
finest regulatory practice in the United States—indeed, in the world." (*See* Appendix
K, June 27, 2003 memorandum.)

25. Complainant Murphy's contributions to the success and growth of the RAS practice
include:

   a.  Leading major engagements with Norwest (now Wells Fargo) Mortgage and
       American Express, each of which resulted in significant follow-on work;

   b.  Managing responses by a number of financial institutions to urgent regulatory demands, including:
   i)   Toronto Dominion Securities,
   ii)  Banco Mercantil,
   iii) First Florida Banks,
   iv) First Federal Savings and Loan of Puerto Rico, and
   v)  State Farm Insurance;

   c.  Assisting at major client engagements—such as Asahi Bank, GMAC Mortgage, and Barclays—leading to follow-on work with billings in the millions of dollars;

   d.  Bringing in clients, such as the Indian trust fund plaintiffs and the Rural Health Care Corporation, which each led to millions of dollars in billings for other PwC advisory practices;

   e.  Providing innovative advice on regulatory structure and related issues to major clients, such as:
   i)   Royal Bank of Scotland,
   ii)  JP Morgan Chase,
   iii) State Street Bank and General Electric (proposed joint venture), and
   iv) Chevron;

   f.  Providing thought leadership both within PwC and more broadly, including through authoring the following publications:
   i)   The first edition of PwC's highly respected "A Foreign Banker's Guide to the United States,"
   ii)  "An Executive's Guide to FIREA,"
   iii) "An Executive's Guide to the FDIC Improvement Act" (which the FDIC itself sent out in response to requests for information about this new law),
   iv) The first edition of PwC's regulatory compliance handbooks (with editing of later editions), and
   v)  "An Executive's Guide to Financial Modernization";

   g.  Training the RAS staff and others within the firm;

   h.  Enhancing PwC's reputation through speaking engagements and through participation in bar association activities with the general counsels of bank regulatory agencies and of major financial institutions and with leading banking law practitioners, including chairing the Banking Law Committee of the Federal Bar Association;

   i.  Perhaps most importantly, assisting PwC to avoid regulatory difficulties (and potential sanctions) in matters arising from client engagements, including those with Centrust FSB, Shawmut National Corporation, Bank of Credit and Commerce International, and Great Smokey National Bank Corporation;

   j.  Working during 2003 with PwC's regulatory/ Congressional liaison staff in formulating the accounting profession's response to regulatory and legislative efforts to increase the exposure of bank auditors to regulatory sanctions; and

   k.  Advising PwC leadership, audit engagement teams, and clients about the requirements of many laws regulating PwC and its clients, including:
   i)   The Sarbanes-Oxley Act, and
   ii)  The Federal Banking laws, including
      (1) The National Bank Act

    (2) The Federal Reserve Act,
    (3) The Bank Holding Company Act,
    (4) The Gramm-Leach-Bliley Act,
    (5) The Federal Deposit Insurance Act, and
    (6) The audit and attestation requirements of §112 of the Federal Deposit
        Insurance Corporation Improvement Act and §404 of the Sarbanes-Oxley
        Act.

26. Since joining PwC in 1989 in the position of Senior Manager, Complainant has been
promoted and received regular salary increases:
  a.  In 1991, Murphy was promoted to the position of Director.
  b.  In 1999, RAS practice head Bench recommended Murphy for promotion to the
      position of Managing Director. Bench informed Murphy that this
      recommendation was rejected because PwC had abolished the position of
      Managing Director. Thereafter, Murphy nonetheless performed the duties of a
      Managing Director, and was referred to as Managing Director in marketing
      materials, proposals and his professional resumes.

27. According to PwC,

  a.  PwC described the position of Director, which Murphy held, as:

      ". . .a lead professional with recognized technical expertise and acknowledged
      credentials in a specific market who has demonstrated practice development and
      project management skills. This position is equivalent to a vice president level in
      a client organization and may be viewed, in some respects, as a partner
      equivalent."

  b.  PwC described the position of Managing Director, for which Bench
      Recommended Murphy before being informed that PwC had abolished the
      position, as:

      "A highly experienced professional who functions in most respects, as a
      partner, has the appropriate experience credentials of a partner and
      possesses established skills in marketing, practice building, technology,
      and staff development." [See Appendix N]

28. In responding to the charges of discrimination filed with the D.C. Office of Human
Rights in 2001 (see Par. 2.b, *supra*), PwC conceded:

"Mr. Murphy is considered by both his colleagues and PwC clients for whom he has
worked as an expert in the field of bank regulatory law. He has enjoyed favorable
reviews of his substantive work since joining Price Waterhouse [in 1989], and such
favorable reviews have continued following the merger [in 1998] that created PwC.
Mr. Murphy. . . has received regular pay increases. . . from $120,000 in 1989 to his
current annual salary of $240,000."

29. In the Fall of 2004, PwC activated the position of Managing Director, and appointed 206 employees to this position, including Murphy. According to PwC management, those selected to this position were "tremendously talented," and, after a selection process of "very serious rigor" were determined to have met a "very high level bar criteria." The selection process required consideration both of personal qualifications and of the business case justifying promotion. Those appointed to the position of managing directors were determined by PwC to possess "a very significant depth of skill, highly significant technical market expertise, recognized expertise, management responsibility, demand in the marketplace, [and] the ability to deal with and solve complex business issues."

30. In recommending Complainant Murphy for the position of managing director, RAS Managing Partner William J. Lewis stated:

> Westbrook is being proposed for the role of a Governance, Legal, and Compliance Subject Matter Expert within FS FORCe. Westbrook was recommended in 1999 by the then managing director of the bank regulatory practice for promotion to managing director. At that time, the managing director position was eliminated by ABAS. Since, Westbrook has been referred to as managing director in marketing materials, proposals and his own biographies. Accordingly, Westbrook has been advised that he is eligible to apply with a business case as a candidate for Managing Director at this time.

> The proposal of Westbrook for this role recognizes both his sustained significant contribution to the growth and success both of Banking Practice and of our Regulatory Advisory Practice business unit, and the leading role he plays as a subject matter expert in:

> - Governance,
> - Compliance,
> - Internal controls,
> - Financial services regulation, and
> - Regulation of the accounting profession.

> **History at PwC**

> Westbrook in 1989 became RAS third professional staff member, and has played an important role in its growth into a leading and highly-regarded regulatory consulting practice.

> * * * * *

> **Thought leader on Sarbanes-Oxley**

> During the last two years, I and Banking leader Tim Ryan asked Westbrook to devote portions of his year for special assistance in the implementation of the Sarbanes-Oxley Act ("Sarbanes"). If fiscal 2003, Westbrook was a member of the FS Sarbanes task force, with a large part of his year specifically devoted to assisting the firm (at a macro level) and the firm's FS leadership (at a micro level) with the implementation of Sarbanes Oxley requirements across a series of firm and client subject areas. In FY 2004, while he

was not seconded to a formally structured effort, he devoted a significant amount of time to matters critical to the firm, emanating from the Sarbanes legislation.

Sarbanes brought significant changes to both PwC and its clients, and Westbrook's substantial analyses of implications associated with these new requirements has been instrumental in ensuring that engagement teams and firm leaders in understanding and responding to these changes. Besides a thorough understanding of the workings of government, Westbrook brought to this effort his self-study of the issues leading to the enactment of Sarbanes, including watching many of the Congressional hearings and reading some of the important literature, such as the "Powers" report on Enron. Westbrook's efforts displayed extraordinary analytical and communication abilities.

The following are just a few of the topics on which Westbrook provided meaningful advice, usually with days (or even hours) of new regulatory issuances:

- A detailed analysis (incorporating comments from other PwC professional staff, PwC independence, PwC risk management, and OGC partners) of how the SEC's new restrictions on non-audit services would affect regulatory advisory engagements. A portion of this memo 10 months later became the basis for a proposed PwC submission to the SEC asking the SEC to revisit the questionable position its staff had taken on the scope of the limitation "expert services;"
- Memos on CEO and CFO certifications under Sarbanes §302, including the meaning of "disclosure controls and procedures;"
- Audit partner rotation;
- Proxy disclosure of audit fees, including consideration of what constitutes an "audit;"
- Corporate governance, including director independence and new audit committee responsibilities; and
- New disclosure requirements for securities issuers

\* \* \* \* \*

Both we and our clients benefited from Westbrook's explanations of this changing world. (See, e.g., the attached story about Westbrook's Sarbanes presentation to the annual convention of the Peurto Rican Banker's Association.) He was the only Director to participate in a September, 2002, meeting of banking partners largely devoted to understanding and preparing for Sarbanes. Additionally, Westbrook produced for firm-wide use by PwC's L&E a computer-based training introductory course on Sarbanes.

**Thought Leader on Governance and Internal Controls**

More recently, Westbrook's efforts have focused extensively on the implementation in the banking industry of the internal control attestation requirements of Section 404 of Sarbanes Oxley, and the unique interaction between 404 and similar internal control requirements imposed on banks 12 years ago by the Federal Deposit Insurance Corporation Improvement Act (FDICIA Section 112). For example:

- His writings in the last 8 months on this subject include two articles for PwC's "Banking Issues", a paper presented at the Spring Meeting of the American Bar Association's Banking Law Committee, and seven memos distributed within the banking practice. (We have shared his papers on the interaction between Sarbanes

404 and FDICIA 112 with regulatory officials at the FDIC and the Fed (the last responding to a specific request from Fed Governor Beis)).

- Within PwC Wes has responded to a steady stream of questions from engagement teams and their clients, including phone calls on 404 issues with MBNA and JP Morgan Chase;
- Wes has participated in policy formulation with me, Lee Dixon, Tim Ryan, and Jim Lee;
- Last September, Wes prepared the slides Jim Lee used to brief the annual Banking Practice conference on the expectations for year-end 2003 bank internal control attestations.
- In June he taught a course on risk and controls at the American Banker's Association's Graduate School of Banking.

Westbrook now is working on a practice guide for PwC financial service engagement teams who are required as part of their annual internal control attestation to consider the effectiveness of the client's compliance function. See PCAOB Auditing Standard No. 2, Pars. 15 & 140. He is drawing not only on his familiarity with financial institution compliance programs, but also on his significant experience with using agreed upon procedures to attest to a client's compliance with important regulatory statutes and regulations, such as those governing Bank Secrecy Act reporting and transactions between a bank and its affiliates. These experiences and expertise will be particularly useful not only in the required audit attestations to internal controls, but also in promoting BD/IM Compliance function certifications

From a technical perspective, Westbrook will be leading our efforts on the following important initiatives:

- Working with the FDIC and the other banking agencies in modifying the existing regulation implementing FDICIA to accommodate the changes resulting from Sarbox, particularly those dealing with internal control attestations;
- Continuing the role he has performed since 1992 of being the "go to guy" in the Banking Practice on questions about FDICIA—a role of particular importance since the next year is likely to bring the most significant changes since FDICIA was implemented 12 years ago;
- Developing the practice aid discussed above for engagement teams to evaluate a client's compliance function as part of the internal control attestation;
- Developing agreed-upon procedures for use in meeting a requirement the Federal Reserve recently imposed on about a dozen of the world's major banks to obtain an independent accountant's attestation to the bank's compliance with certain anti-money laundering laws when distributing large amounts of U.S. currency; and
- Cross-selling with IM and BD Compliance personnel the services of annual compliance function certifications.

**External Recognition**

~~Westbrook continues to be well known and well regarded among his peers outside the~~ firm. For the last two years he has moderated a panel of the bank regulatory agency general counsels for the Banking Law Committee of the Federal Bar Association (see attachment), and now chairs that Committee. (Committee members include the general counsels of the bank regulatory agencies, the SEC and the Treasury; of the New York

Clearing House, the Financial Services Roundtable, and other major trade associations; and leading members of the DC banking bar. In past years, Westbrook's contacts with members of this group have led to engagements with fees of several million dollars, as noted above. His July 2004 letter to the *American Banker* about the enforcement powers of the Office of the Comptroller of the Currency drew thanks from the OCC, including from Comptroller Hawke himself (a long-time professional colleague and past chair of the same FBA Committee).

(*See* Appendix L, Prospectus re: promotion to Managing Director.)

31. Murphy believes, and therefore alleges, that the great majority of the employees promoted in October 2004 to the position of managing director are over the age of 40, and are older than the great majority of employees who were promoted to partnership during 2004. The Respondent PwC pays substantially less money and benefits to Complainant and to other managing directors, and gives to them less responsible assignments, than to those persons who have the title of "partner" or "principal."

32. More than 2,000 of PwC's U.S. employees are limited liability partners of PwC. Under Delaware law (6 Del. Code §1515) and §8.2 of the Agreement, these partners are not liable for the debts of PwC; and under §§5.6(t) and 8.1 these partners have no right to share in PwC's income except as determined by the Board.

33. Except for members of the Board, and perhaps a few other PwC management officials, the limited liability partners of PwC are "employees" within the meaning of §11(f) of the Age Discrimination in Employment Act, 29 USC §630(f), and the DCHRA, D.C. Code §1-2512, and other state laws and thus protected against age-based discrimination in the terms and conditions of their employment. PwC's own partners have stated:

i) "There is no sense of partnership."
ii) PwC has a "corporate style of governance."
iii) "It isn't a practice anymore; it isn't a partnership any more; it's a business."

(*See* Appendix M, August 13, 2002 memorandum.)

34. PwC's routine practice is to compel partners to retire at age 60, as stated in §10.1 of the Agreement. This mandatory retirement age discriminates against most of PwC's nominal "partners" in violation of the ADEA and the DCHRA. PwC and its Board have continued to implement this age-based retirement policy although they had full knowledge of the likelihood that such policy violates Federal, State and local equal employment opportunities laws.

I have commenced no civil, criminal or other administrative actions based on the above allegations concerning promotions made by PwC other than as set forth in Paragraph 2.b.

12

This complaint is CROSS FILED with the District of Columbia Office of Human Rights.

**Complainant,** being duly sworn, hereby deposes and says that he has read the foregoing Complaint and knows the contents thereof; that the same is true of his own knowledge, except as the matters therein stated on information and belief; and that as to these matters he believes the same to be true.

_C. Winthrop Murphy_

COMPLAINANT MURPHY

Subscribed and sworn to before me on this 4th day of March, 2005.

Gretchen R. Waller

Notary Public, District of Columbia
My Commission Expires 5-31-2009

13